GULF, COLORADO & SANTA FE RAILWAY COMPANY
v. LYDDLETON SMITH AND WIFE.

No. 1190.

**Fact Case—Negligence Not Shown.**—See facts held to show due care by the railway company in providing proper locks for the water closets in the cars, in inspecting them to see that they were in good order, and in efforts to extricate a lady passenger detained in the water closet owing to the lock of the door becoming out of order. The facts show no cause of action against the railway, and the judgment below is reversed, and judgment is here rendered for the railway company.

APPEAL from Milam.    Tried below before Hon. JOHN N. HENDERSON.

The opinion states the facts.

*J. W. Terry* and *Chas. K. Lee*, for appellant.—1. Negligence, as a general proposition, is not presumed, but must be proven, and the burden is on the plaintiff to establish the same. The only cases in which a presumption of negligence is indulged are cases in which, from the very nature of the facts and circumstances, all the evidence, if any, of negligence lies in the power and control of the defendant, and is not probably accessible to the plaintiff; and negligence is only presumed in those cases where the defendant declines to introduce evidence showing all the facts and circumstances material to a determination of the question of negligence vel non. There is no presumption of negligence where all the facts are laid before the jury, either by the plaintiff or by the defendant.

2. A mere scintilla of evidence, or mere surmise, will not support a finding of negligence.

3. Where the facts are undisputed, and there is no evidence on which the court would be warranted in allowing a verdict to stand, it is the duty of the court to direct a verdict for the defendant. Railway v. Faber, 77 Texas, 153; Railway v. Robinson, 73 Texas, 277; Mason v. Eddy & Cross, 3 Texas Civ. App., 148.

*W. T. Hefley* and *E. L. Anthony*, for appellees.—The duty to be observed by railways in carrying passengers is the highest degree of care. Railway v. Brown, 4 Texas Civ. App., 435; 2 Posey's U. C., 241; Ray on Neg., sec. 65; 16 S. W. Rep., 233; 15 S. W. Rep., 808; 56 N. W. Rep., 808.

As to charge on negligence, defining "utmost care" in providing for safety of passengers. Railway v. Worthington, 21 Md., 288.

As to elements of damage on contract of carriage. Stewart v. Tel. Co., 66 Texas, 586; 84 Texas, 40; 4 Wills. C. C., sec. 166; 82 Texas, 547.

FISHER, CHIEF JUSTICE.—Appellees (plaintiffs below) instituted this suit in the District Court of Milam County to recover of the appellant damages on account of Mrs. Alpha Smith, one of the plaintiffs, while a passenger on the defendant's railroad, becoming fastened up in a water closet of one of the passenger cars of the defendant, causing mortification, shame, and suffering of mind, to the alleged damage of plaintiffs in the sum of $5000, plaintiffs alleging, that the door of the closet became locked by and through the negligence of the defendant, and that the defendant and its servants negligently failed to use proper efforts to release Mrs. Smith from her embarrassment, and restrained the plaintiff Dr. Smith from so doing, the acts and omissions being fully set out in the petition. Defendant answered by general demurrer and general denial. Trial October 25, 1893, and judgment for the plaintiffs for $500.

*Opinion.*—We here set out in full the facts as shown by the record:

Dr. L. Smith, being sworn, testified for plaintiffs as follows: "I am one of the plaintiffs in this case. The other plaintiff, Alpha Smith, is my wife. On the 11th day of March, 1891, myself and wife boarded the defendant's passenger train in Cameron to go to Brenham, Texas, a distance of about 60 miles. I purchased two tickets, one for myself and one for my wife, paying the regular fare therefor, from the ticket agent at Cameron, before taking passage on said train. We went on our journey all right until we reached Somerville, and just after passing Somerville my wife had occasion to visit the water closet on said car. She remained in said water closet longer than usual, and I went down towards said closet and heard her knocking on the door of said closet and calling me. I went to the door of said closet and tried to open it, but found it locked. I told the conductor that my wife was fastened up in the closet, and I wanted her out. The conductor tried to open the door, but it would not come open. I started to kick the door open, but the conductor pushed me aside and said, 'Don't do that; we will let her out.' He then told the brakeman to go out on the platform, raise the window, and get inside the closet and try to unlock the door, which he did. My wife, I think, assisted in raising the window, and in doing so she hurt her finger. The brakeman went into the closet through the window which opens out on the platform between the cars. When the brakeman got in the closet he tried to open the door, but did not succeed; then some one handed him an axe. I saw him trying to prize the door open with an axe. I told him to knock the lock off, but he did not try to knock it off—kept on trying to prize it off. I then pulled my wife

out of said closet, head first, through the window the brakeman went in. When I did this I was standing between the cars on the platform, and the cars were in motion. I took my wife from the closet when about half-way between Gay Hill and Brenham. I was sheriff of Washington County six years just after the war, and I know the country well. I watched the brakeman while fumbling with the lock; could see him all the time; he made no attempt to break the lock. I could have smashed the lock with the axe. Just after my wife was extricated from the closet, I told the brakeman that I was going to sue the company for damages, and he said, 'I don't give a damn about damages.' After my wife was locked in the closet we passed two stations, Quarry and Gay Hill.

Cross-examined: "I have never examined the character of locks used by the Santa Fe road on its cars and on the water closets in the same. I base my opinion as to whether or not the lock could have been broken off with axe on what I know of ordinary door locks. Do not know what character of metal the locks used by the defendant on its doors are made of, or how stout they are. I do say, however, that I could have broken that lock with the axe. I think the door could have been broken in from the outside, but the conductor would not let me. It is not a fact that my wife stepped up on the seat and stepped out at the window the brakeman had gone in. I had to take her by the shoulders and lift her out bodily. If the conductor had done as I told him, he would have gotten my wife out very much sooner than he did. It is because he did not do as I told him that this suit was brought."

Mrs. Alpha Smith, for plaintiff, testified as follows: "Dr. L. Smith and myself have been married forty years. While Dr. Smith and myself were going to Brenham on the defendant's train, on the 11th of March, 1891, and just after leaving Somerville, I had occasion to go into the water closet. After remaining in there a short time I tried to open the door to come out, and found I could not open it—it was locked or fastened some way. I knocked on the door and called my husband. I was very much frightened and excited. I raised the window, and the brakeman came into the closet through said window and tried to prize the door open or the lock off with an axe. I asked him several times to knock it off and let me out, but he did not try to knock it off—kept on trying to prize it off. My husband then took me through the window; I went through the window head first; my husband received me from the outside. The scent in the closet was disagreeable, and it was a very unpleasant place to be, especially with a brakeman. I was so excited I do not know how long I staid in the closet, as a minute seemed like an hour under the circumstances. When I was being taking out of the closet I can not say whether the train stopped or not, but it slowed up. There were a good many persons on the train. Of course it was very embarrassing and mortifying to me."

Cross-examination: "I can not tell you how long I was in the closet. It seemed to me more like an hour than anything else, but I was excited and mortified, and I do not know how long it was. They had gotten me out before I got to Brenham, but I do not know how long before. I do not know what kind of a lock that was, and do not know whether it could have been broken off with the axe or not. The closet was small. I do not think there was room in the closet for me to have gotten around behind the door, and gotten away from the door, if the same had been driven in from the outside. I do not know that I just stepped on the seat in the closet and stepped out through the window on to the platform on the outside; I think I did not. Dr. Smith took me by the shoulders and lifted me out by main strength. When we got to Brenham we went to Mrs. Vinson's. I met Mr. Bettison, the witness here in this case, there on that date. Yes, they were laughing and talking about my being locked up in the closet that day. They were joking about it and laughing about it, but it was no joke to me. Yes, we were all laughing about it, but it was all over then and I was among my friends; it was not like it was on the car among strangers. I do not know who was on the platform of the coach when I got out of the window. I think the conductor and porter of the Pullman car were there, and Dr. Smith was there. Do not know whether any one else was there or not. I can not tell you whether I would have been just as much mortified or more mortified if the door had been broken down from the outside and I had to walk out of the closet into the car full of passengers. I do not know about that; I could not say; but it was a very mortifying predicament to be put in."

Henry E. Gates testified, by depositions, as follows: "On the 11th day of March, 1891, I was Pullman car conductor on the Gulf, Colorado & Santa Fe Railway, and was on the train when Mrs. Smith was fastened up in the closet. I came out of the sleeper on the platform, and heard that there was a lady in the closet; then I saw her through the window. I also saw a brakeman in the closet with her, trying to unfasten the door. I took the axe from the sleeper and handed it to the brakeman through the window, and he tried to pry the door. I went inside the car and threw my weight against the door to force it open. I do not know how long the lady remained in the closet, as she was there sometime when I saw her. I saw a gentleman who seemed to be the traveling companion of the lady in question. I do not remember seeing him make any effort to break the door or release the lady; do not remember his making any demand on any one in reference to the matter; do not remember his actions, what he said, or whether he showed anger or impatience or not. I think the lock could have been broken open or off with the axe the brakeman had."

J. M. Porterfield, witness for defendant, testified: "On the 11th day of March, 1891, I was conductor in the employ of the defendant railway company, I was conductor on that date in charge of its train number 1 from Purcell, I. T., to Temple, Texas. This is the same

train that went on from Temple to Galveston. One of the cars that I had in the train that day was A. T. car No. P–515. The lock on the closet of that car was working all right all the way down from Purcell to Temple. I know this, because I would open the closet door every time we left a station, going through the train to take up tickets, to see if anybody was in the closet. I had no trouble whatever with the lock on that car of the train that date."

Ben Bowman, witness for the defendant, testified: "I was conductor of the train on which Mrs. Smith was a passenger at the time she got locked up in the water closet. She was locked up in the closet in A. T. car No. P–515. I know this from my train book of that date, from which I have refreshed my memory. I had no trouble with the lock on that closet from the time I left Temple until the time Mrs. Smith was locked up in it, after leaving Somerville. I took the train at Temple. I make it a habit, in taking up tickets after leaving each station, to open the closet door to see there is no one in there. I do not know what first called my attention to Mrs. Smith's being locked up in the closet—whether it was Dr. Smith, or hearing the noise in the closet. Dr. Smith asked me to get her out, and I told the brakeman to go around to the outside, open the window and go inside, and see if he could not unlock the closet door. I do not think that I stopped Dr. Smith from trying to break the door down, or told him not to break the door down. I told the brakeman to knock the lock off with the axe; that is what he got it for. I think it would not have been safe to have ·broken the door down from the outside, because the door might, from the force of the blow in breaking it open, have been forced back against the lady inside of the closet, and caused her serious injuries.. The door of the closet opened towards the inside. The brakeman got inside of the closet, and about that time we were running into the station at Gay Hill, and I left the brakeman to get the lady out, and went to help the passengers on and off at Gay Hill station. I came back through the train after leaving the station of Gay Hill. Dr. and Mrs. Smith were then sitting in the passenger coach. They did not seem to treat the matter seriously, but seemed to treat it as a joke. Mrs. Smith did not seem to be mortified, that I noticed. The matter was treated as a joke. It is 4½ miles from Somerville to Gay Hill, and it is 10 miles from Gay Hill to Brenham. There is a station between Somerville and Gay Hill, called Quarry station. That was a flag station at that time—that is, a station where we only stop to let on or let off passengers on signals, or when we have passengers to let off at that place. I do not remember whether we stopped at Quarry on that date or not; I could not say. From the schedule then in force, it took us twelve minutes to run from Somerville to Gay Hill, and twenty-two minutes to run from Gay Hill to Brenham. We were on time that date and made schedule time, or about schedule time. I was not present when Mrs. Smith got out of the water closet, and do not know how she got out."

M. G. Cleveland, witness for defendant, testified: "I was brake-man on the train on the date that Mrs. Smith got locked up in the water closet. The conductor told me a lady was locked up in the closet, and for me to open the window out on the back platform, and get inside and see if I could unlock the door. I went to the window and asked the lady to open the window, and she did so, and I got inside and tried to unlock the door. I supposed the door was caught some way and I could get it open, but I found that I could not. About that time some one handed me an axe, and I was trying to prize the lock off with the axe. I was trying to get the edge of the axe worked in be-tween the lock and the catch, and so prize the lock off. Mrs. Smith said, "You need not break the door; I can get out the same way you got in,' and she just stepped on the seat in the water closet and got out through the window onto the platform. Dr. Smith did not take her by the shoulders and lift her out, but she just stepped up on the seat and stepped out on the platform. I weigh 185 pounds. Mrs. Smith weighs, I suppose, about 100 or 110 pounds. The window in that closet was a large window. It was one of the Atchison coaches, and the windows in those coaches are large. The windows are 24 by 26 inches. I had no trouble in getting into the closet through the win-dow. I am considerably larger than Mrs. Smith. There was no one present at the time Mrs. Smith got out of the window except the Pull-man car conductor, Dr. Smith, and myself. There was no crowd col lected around. Mrs. Smith got out of the window just as the train stopped at Gay Hill and while it was standing still. The closet was small and there was no room in there to wield the axe, and I do not think the lock could have been broken off the door by striking it with the axe. To attempt to strike it with the axe would have been dan-gerous to Mrs. Smith, as in the small, confined space there, Mrs. Smith might have been hit with the axe. I did not tell Dr. Smith at the time his wife got out of the closet that I did not give a damn about the damages. I did not say anything of the kind to them. A few days afterwards I came up on the train, and Dr. Smith got on, I think, at Brenham. He was standing on the platform, was in my way in the performance of my duties, and I asked him to step inside of the coach. He said something about looking up witnesses for a lawsuit, as he was going to sue the company for having locked his wife up in the closet. I told him that I did not have anything to do with that, but I wished he would go in the car and out of my way, so that I could perform my duties."

I. N. Bettison, witness for defendant, testified: "I am a machinist by trade; am not doing anything right at present; the last work I did was well boring. On the 11th day of March, 1891, I was car inspector for the defendant company at Brenham, Texas. When the train ar-rived at Brenham, Texas, at the request of the conductor, I went into the closet that Mrs. Smith had been locked up in, and took the lock

off to fix it and see what was the matter with it. The lock I have here is exactly the same kind of a lock that was on that door that day. [Witness here shows to the jury a lock.] The lock is of the finest and most approved pattern. It is one of the most expensive locks made. They cost $4 each at the foundry at wholesale. They are made of cast brass, and the workmanship on the whole lock is of the very best. There are no better locks made or used that I know of. I have never seen any better locks in use on railroad cars or anywhere else. On opening the lock I found that it had been broken in this wise: By an inspection of the lock you will observe that the bolt or catch on the lock is drawn back when the lock is in good repair by the turning of the knob or handle. You will see inside of the lock a piece of brass or metal which connects the two knobs of the lock together, and which is in the shape of a round bar, but inside of the lock it is cut in two in the center, so that it presents a flat surface or plane parallel with the face of the lock as the same is fastened on the door. Right back of this flat surface and fastened close up to it is a metal connection with the bolt or clasp, and so fastened that when the bolt is turned this metal fastening, or the back part of the same, is drawn back by the pressure of the flat side of the flat surface or connecting piece between the two knobs, which draws back the catch of the lock and so opens the door, and so that if you break the piece of metal bearing against the back side of the flat surface of the bolt or bar connecting the two knobs, there would be nothing to draw the catch of the lock back, and you might turn the bolt as much as you pleased and the lock will remain fastened. It is this metal bearing that lays against the flat surface of the bolt or bar connecting the two knobs together that was broken in the lock in question. As long as that piece of metal remained unbroken the lock would respond to the bolt and come open, but as soon as it was broken you could not get it open by turning the bolt back. I know of no locks that are made that will not get out of repair. A piece of machinery will break and get out of repair in spite of all you can do. I was in the closet that day some little time working on this lock, and did not find the closet offensive at all. It seemed to be as clean as a closet could be. I do not think that this lock could have been broken inside of that closet by a man inside of the closet using an axe. The lock is very strong, made of cast brass, and, as you will observe, very solidly made throughout. You will also observe that the catch, or piece in which the bolt of the lock works for a fastening, is doubly secured by being screwed on, both on the outside and also on the inside of the face of the lock, so that when the door is fastened, though you were to cut the screws on the outside that are exposed to view, and which could be gotten at with an axe, you will not release the fastening, but you will have to cut through or break those two brass pieces which are made to hold the screws which are screwed in the face of the lock—the screws which are not exposed

when the door is fastened—or you will have to force these screws out by main strength. You can not get at them with a screw driver to take them out, as long as the door is fastened. You can take the screws which are exposed to view out, but not the others. These screws are brass, and strong, and it would take a great deal of force to pull them out. I do not think you could have gotten that lock off of that door without substantially battering the door down. Those doors are made of hard wood, and it is not an easy matter to batter them down. I was at Mrs. Vinson's the day that Dr. and Mrs. Smith got there—the day that she got locked up in the closet. Mrs. Vinson is my mother-in-law. I and my wife were at the house that evening. Mrs. Smith was there, and she and my mother-in-law and my wife were all laughing and joking about her being locked up in the water closet. They treated it as a joke, and laughed and talked about it. Nobody seemed to regard it seriously. I laughingly asked her why she did not stay in the closet until she got past her destination, and she would have had a good suit against the company for $5000, and she replied, 'O! why didn't I?' She then said, 'Well, I did not want to stay away from Dr. Smith so long.' I replied, 'Well, you could afford to stay away awhile for a few thousands.'"

Cross-examined: "I do not undertake to say that this lock could not be broken with an axe. It might be mashed all to pieces with an axe, but I give it as my opinion that that lock could not have been broken from the inside of the closet by a man in the closet with an axe."

From these facts, we conclude that the appellant was not guilty of negligence in failing to furnish a suitable lock to the door of the water closet, and the facts do not show that it was guilty of negligence in failing to keep the lock in good repair. And we also find, that the wife of appellee was against her will in the water closet only a few moments, and that when it was discovered that she was locked in the closet, the appellant with reasonable dispatch resorted to reasonable and proper means under the circumstances to extricate and release her from the closet. On neither branch of the case as relied upon by appellee do the facts show that the appellant was guilty of negligence. The closet door becoming locked was one of those accidents that frequently happen, although extreme diligence may be exercised in inspecting the locks. The lock was evidently, when the lady entered the closet, working all right, and was, when turned by the conductors in opening the door previously upon that day, in working order. If any defect existed previous to that time it is not shown, nor is any fact shown from which it may remotely be inferred that the appellant failed to inspect the lock. No defect was discovered until after the appellee's wife attempted to leave the closet, and up to that time it appears that the lock was in working order, and there is no fact that arises out of the evidence that would before then call upon the appellant to inspect or examine the lock for any defect. It is not shown,

even inferentially, that the appellant was derelict in any duty looking to an examination or inspection of the lock before the circumstance in question. The facts show, that after the appellee's wife was discovered in the closet, the brakeman and conductor with reasonable dispatch under the circumstance resorted to reasonable means to open the door of the closet, and that she voluntarily left the closet through the car window. From the evidence, it is doubtful if it would have been safe to appellee's wife to open the door from outside the closet by forcing it in, as likely she would have been injured, and it may have been as equally dangerous to her for the brakeman to undertake to break the lock by striking it with the axe in the narrow space in which he and Mrs. Smith were confined. In view of the danger to her that likely existed if those efforts had been resorted to to open the door, it was not negligence in the servants of appellant to delay taking other steps in order to extricate her until after they had made all reasonable efforts to open the door by the means and efforts they used in that direction. Before resorting to means to extricate her that were apparently attended with danger, it was proper for them to seek to accomplish this purpose by other means that were reasonably calculated to effect the purpose, and that would not expose her to danger; and from the facts it appears that their efforts in this direction were diligently pursued, and no unreasonable delay resulted. While they were in the reasonable exercise of this duty she escaped from the closet by going out of the car window, with the assistance of her husband.

It appears that this case was fully developed in the trial, and there is no reason to expect that the evidence will be different from that as shown by the record. Therefore, the judgment of the court below will be reversed, and judgment here rendered in favor of appellant.

*Reversed and rendered.*

Delivered April 3, 1895.